Henry Silverman, J.
This is an action hy an agency of the
State of California (the Department of Mental Hygiene) to recover from the defendants charges incurred by one Jeff Jarija, also known as Jevrum Karijo, as a patient in a State hospital during the years 1951 to 1955, inclusive, aggregating $4,721.61, the sum in suit. The plaintiff’s ease is predicated upon a so-called “ affidavit of support ” which the defendants furnished to an American consul in a foreign country in January of 1948 in order to induce the issuance of a consular visa by which the said Jarija was enabled to enter the country as an immigrant. He was never naturalized and was not deported. Although for a time the defendants, naturalized citizens of the United States, and husband and wife, the wife being the aunt of the said immigrant, helped to support him, they ultimately abandoned him to the public authorities and he became an inmate of various public institutions in California.
The question here is whether, by the said affidavit of support, the defendants undertook a legal obligation or a moral one. The plaintiff contends that the provisions of the said affidavit in effect constitute a contract between the United States of America and these defendants and that it, the plaintiff, is a third-party beneficiary.
It is true that the following averments of the said affidavit, which was executed by these defendants, read like the terms of a contract: ‘1 That we are willing and able to receive, maintain, support the aliens after their immigration to the United States, and hereby assume such obligations guaranteeing that none of them will at any time become public charges upon any community in the United States; and that any of school age will be sent to school. ’ ’ Such provisions follow a form which was apparently prescribed by the Department of State. However, the department, and indeed any officials, executive or administrative, could not properly require a contract of these defendants or of others who executed similar affidavits unless such a contract is within the purview and contemplation of .the statute unjer which the *617 governmental authorities acted. It becomes necessary to look ro the statutory authority pursuant to which regulations were promulgated and affidavits of support obtained from relatives or other sponsors of aliens seeking entry into the country.
The procedure for issuing visas was established by administrative regulations implementing the statute under which this alien entered the country (39 U. S. Stat. 874, § 3; U. S. Code, tit. 8, § 136). This statute is in substance the same as that which is now in effect, to wit, paragraph (15) of subdivision (a) of section 212 of the Immigration and Nationality Act, reading as follows:
“ Sec. 212(a). Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States: # * *
“ (15) Aliens who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission, are likely at any time to become public charges;”
The visa division of the State Department has apparently long required that affidavits of support contain averments similar to those which were made by these defendants as hereinabove quoted in the said Immigration and Nationality Act. There is no specific statutory provision upon which such requirement rests. However, as aliens are £ £ ineligible to receive visas ’ ’ if £ 1 in the opinion of the consular officer at the time of application for a visa ’ ’ they £ 1 are likely at any time to become public charges ’ ’, the visa and consular officials charged with the administration of the statute apparently came upon the idea of insisting upon affidavits such as the one in suit in order to lessen the likelihood that an applicant for a visa would in fact at any time become a public charge. The statute deals only with considerations of likelihood and probability. It does not evidence any intention to fasten a contract upon anyone which would insure the support of the immigrant for any fixed period of time, or until he becomes a citizen. No case so holds; no persons responsible for the administration of the statute have ever taken such a view. It has long been the fixed administrative view that these affidavits of support impose only a moral obligation. Various exhibits have been submitted to the court which so indicate. A pamphlet titled ££U. S. Befugee Belief Program” (Dept, of State Pub. 5724, General Foreign Policy Series 96, Beleased Jan., 1955) and distributed generally by the Department of *618 Documents, United States Government Printing Office, at a price of five cents, contains the following questions and answers:

“ Does a citizen in sigmng an assurance to provide a job and housing involve himself in a contract?

“ No, the assurance is not considered to be a contract but a personal moral obligation of good faith to provide work and housing on arrival of the refugee. Should difficulties develop subsequently, the endorsing agency may be depended upon to lend assistance.

“ Besides the citizen signing the assurance and the voluntary agency endorsing it, may anyone else be included in the sponsorship of a refugee?

“ A citizen may sign an assurance on his own behalf; on behalf of a church, welfare agency, or other bona fide group of citizens; or on behalf of a noncitizen. ’ ’
Although the date of publication of this pamphlet is some seven years later than that of the execution of the affidavit in suit, nevertheless the questions and answers hereinabove quoted illustrate and indicate the long established view, which was never different. Nor do the statutes and regulations presently in effect differ so substantially from those which were operative at the time these defendants executed their affidavit that a different interpretation or result would be indicated or warranted. Indeed, the Displaced Persons Act of June 25, 1948 (U. S. Code, tit. 50, ch. 647; 62 U. S. Stat. 1009) and the Refugee Relief Act of August 7,1953 (U. S. Code, tit. 50, ch. 67 U. S. Stat. 400), are more specific than earlier statutes in force when the affidavit in hand was made in requiring “ assurances ” that aliens applying for admission into the country will not become public charges. Yet even under these later statutes the view of administrative officials, which, as already indicated, they have freely conveyed to the public, has uniformly been that such “ assurances ” do not impose a legal obligation.
Among the exhibits which have been submitted to the court on this motion is a letter of one O’Connor, Commissioner, Displaced Persons Commission, United States Government. This letter, dated November 29,1948, referring to the Displaced Persons Act of 1948 and addressed to the National Lutheran Council, reads in part as follows: “We are aware that you have had a number of questions concerning the public charge feature of the Displaced Persons Act of 1948. The following explanation may be given to anyone who raises this question with you: The law requires that assurances be given against the alien’s becoming a public charge. Although this does not constitute a legally *619 enforceable undertaking, it should be predicated upon good faith and an honest resolve so to guide the alien’s activities and welfare as to give reasonable assurance against the likelihood that he may become a charge upon the public.” Another letter, by one Rosenfield, acting chairman of the Displaced Persons Commission, dated June 12, 1950, also addressed to the National Lutheran Council, reads in part as follows: “ As you know, on the assurances which are filed in behalf of a displaced person, the sponsor assures that the displaced person shall not become a public charge. However, the Commission has interpreted this responsibility on the part of the sponsor to be a moral obligation only, and not a legally enforceable undertaking.” As long ago as March 1, 1939, one Shaughnessy then deputy commissioner of immigration, wrote to a member of Congress, Mr. Seeger, in part as follows: “ A person who files an affidavit of support for the purposes of facilitating the issuance of a visa to an applicant does not thereby incur legal responsibility so far as the immigration laws are concerned, although it should be understood that a most serious moral obligation is undertaken by the affiant. ’ ’
This seems to be the view which has uniformly prevailed, and if it is to be changed at all this should be done by statute which will give sponsors notice that they undertake a legal obligation of a definite kind. It is unlikely that any statute would impose an unlimited obligation which would vary from case to case. It is easy to conceive of a situation in which an immigrant might incur medical or other expenses of an extraordinary nature and the liability upon the sponsor might be so great as to be disastrous. If there is to be a legal liability, a statute would probably confine it within a reasonable area.
A report of the Committee on the Judiciary of the United States Senate, made in March of 1957 by its Subcommittee to Investigate Problems Connected with the Emigration of Refugees and Escapees, pursuant to S. Res. 168 — 84th Congress, 2d Session, as extended by S. Res. 84, 85th Congress, reads in part as follows: ‘1 In the early days of March 1956, with the cutoff date approximately 9 months off, one such statistical report disclosed that around 90,000 visas had been issued, out of the 209,-000 permissible. The subcommittee chairman and the general counsel conducted investigations in Detroit, New York, Chicago, St. Louis, Jefferson City, Mo., and Boston in an effort to ascertain just what were the stumbling blocks to the successful operation of the act. In those cities, the chairman, on many occasions accompanied by officials from the Department of State, and the general counsel, addressed large audiences, urging interested *620 people to give assurances for the refugees and explaining the extent of the liability assumed by the maker of an assurance. The Department of State representatives pointed out that while the maker of an assurance assumed no legal liability, he did assume a moral obligation which should not be regarded lightly and which he would be expected to live up to, even though it may not be legally enforcible.” The basic pertinent provisions of the statute to which this report refers, except by making explicit the provision for the requirement of “ assurances ” from sponsors, do not differ in substance from those under which this immigrant entered the country. Also, the report of the Senate Committee on the Judiciary of April 20,1950, titled “ The Immigration and Naturalization Systems of the United States ” (Senate Report No. 1515, 81st Cong., 2d Sess.), includes the following comment :
“ h. Comment
‘ ‘ There is no provision in the law authorizing American consuls to require the posting of a bond by alien applicants for either immigrant or nonimmigrant visas. Numerous suggestions have been received from consuls throughout the world that such authority be given. Others have suggested that consuls be given authority in doubtful or borderline cases to withhold the issuance of visas until confirmation has been received from the Immigration and Naturalization Service that a bond has been posted in the United States in behalf of the applicant and that such a procedure would materially reduce the number of nonimmigrant applicants for visas who are not bona fide nonimihigrants.
‘ ‘ Similar suggestions were received from consuls with reference to applicants for visas who are applying for admission to the United States for permanent residence. The usual sponsor’s affidavits are of no value if the immigrant alien becomes a public charge, since they involve merely a moral obligation and are not enforceable as contracts. In view of certain proposals to be made regarding the power of consuls to refuse visas in practically every case in which the Immigration Service has the right and duty to exclude, it is not believed that consuls will experience the same difficulties of decision in the future. Consequently, the subcommittee does not believe that the power to require bonds will be necessary to consuls. ’ ’ (P. 643.)
Notwithstanding the requirements imposed by the visa division of the State Department and enforced by consular officials abroad which led to the use of the language (in the affidavit of these defendants) upon which the present suit is based, no statute, regulation or rule prescribes that a financial sponsor of *621 an immigrant undertake an obligation of the kind which the plaintiff contends was here assumed. The official instructions of the State Department to sponsors (DSL-650-3-30-56), titled “General Information Regarding Visas for Immigration ”, read in part: “Affidavit of Support: There are no prescribed forms to be used by persons in the United States who desire to furnish financial sponsorship in the form of a so-called affidavit of support for presentation to the consul on behalf of an immigrant. Each sponsor may furnish a statement in affidavit form to show his financial ability and willingness to contribute to the immigrant’s support, giving due regard to the sponsor’s obligations toward members of his own family and other persons. The statement of the sponsor should include information regarding his income, and where material, information regarding his resources, obligations and expenses and the plans and arrangements made for the applicant’s support in the absence of a direct obligation toward him. To substantiate the information regarding income and resources the sponsor may attach to his affidavit a certified copy or notarized copy of his latest income tax return; a statement from an employer showing the employee’s salary and the length and permanency of employment; a statement from an officer of a bank regarding the sponsor’s account, showing the date the account was opened and the present balance, or by other evidence adequate to establish the financial ability of the sponsor to carry out his financial undertaking toward the immigrant. ’ ’
If an enforcible legal obligation were contemplated by the statute, it is reasonable to suppose that it would have well-defined limitations concerning amount, duration and other conditions. Indeed, there is a statute by which a fixed obligation is imposed. The Attorney General, and only the Attorney General, is authorized to require a bond as a condition of entry. Section 213 of the Immigration and Nationality Act (66 U. S. Stat. 188) in substance the same as section 21 of the Act of 1917, reads as follows: “ Sec. 213. Any alien excludable because he is likely to become a public charge or because of physical disability * * * may, if otherwise admissible, be admitted in the discretion of the Attorney General upon the giving of a suitable and proper bond or undertaking approved by the Attorney General, in such amount and containing such conditions as he may prescribe, to the United States and to all States, Territories, counties, towns, municipalities, and districts thereof holding the United States and all States, Territories, counties, towns, municipalities, and districts thereof harmless against such alien becoming a public charge. In lieu of such bond such alien may *622 deposit in cash with the Attorney General such amount as the Attorney General may require ’ Bonds required under this section do not usually exceed $1,000. The existence of this statute suggests the absence of any legislative intent to impose a legal obligation by the giving of a mere affidavit of support in order to satisfy a consular officer that an applicant for admission into the country is not likely to become a public charge. Paragraph (15) of subdivision (a) of section 212 of the Immigration and Nationality Act hereinabove quoted, unlike section 213, does not authorize or permit any executive or administrative official to require a contract, and any assurance given to such official, though in affidavit form and no matter how strong the language used, cannot therefore constitute a contract. The customary administrative applications of section 213, under which a relatively small amount is generally asked for as security, also indicate an administrative view negativing the notion that the defendants came under a legal obligation so extensive and so ill defined as the plaintiff seeks to impose upon them. It is interesting to notice that section 213, by which a bond may be required, specifically makes States, municipalities and other agencies of State Governments third-party beneficiaries thereof. There is no similar statutory or regulatory provision applicable to an affidavit of support.
The general purpose of these affidavits of support is transparently clear when consideration is given to the history of immigration, and in statutory interpretation these historical considerations are not without importance as extrinsic aids in construction (cf. McCaffrey on Statutory Construction, § 42, pp. 79-81 and cases there cited). The comments of the learned author and the cases cited by him indicate the weight to be attached to historical considerations as well as to “ the official opinions of the law officers of the government with respect to the meaning of a particular statute ’ ’. Here, as hereinabove shown, the ‘ ‘ law officers ’ ’ of the Government have publicized their opinions in order to induce persons to execute such affidavits.
The General Immigration Law of August 3, 1882 (22 U. S. Slat. 214) in section 2, “banned” any person who appeared unable to become self-supporting. Administratively, as is well known to persons familiar with the practice once followed on Ellis Island, this statute was enforced by requiring the immigrant to show some money upon his arrival here. A small sum, enough to obtain him immediate food and lodging, seemed to suffice. The underlying idea is concisely stated in the following regulation of the Immigration and Naturalization Service of *623 the Department of Justice: “ In the absence of a statutory provision, no hard and fast rule can be laid down as to the amount of money an alien should have. This is only one element to be considered in each case, but generally he should have enough to provide for his reasonable wants and those of accompanying persons dependent upon him until such time as he is likely to find employment; and when bound for an interior point, railroad ticket or funds with which to purchase same.” (Code of Fed. Beg., tit. 8, § 110-42.)
Thus, an alien is not admitted if he will soon become a public charge. He should have enough to tide him over until he establishes himself. If he fails to do this within a reasonable period of time he may then be deported, as could have been done in this case. The “ assurances ” of support, like the ready cash which an immigrant was once required to show, are not intended to insure that he will never, at any time in the distant future, become a public charge. This immigrant entered the country on February 22,1948. He first became a public charge, at least in California, on May 31, 1951. He appears to have been employed in New York City by his uncle and others for approximately two and a half years following his entry. It was not until August of 1950 that it became necessary to receive him as a psychiatric patient in Bellevue Hospital in the city of New York.
In view of what has been said, it becomes unnecessary to consider defendants ’ contention that this plaintiff is not authorized by the statutory law of California to bring this action.
Concerning the contention of the plaintiff that the law of the case has been made by an interlocutory order denying the motion to vacate the warrant of attachment: The present motions for summary judgment are based upon affidavits which were not before the court upon the motion to vacate the warrant of attachment. A decision allowing a warrant of attachment to stand would not, at the trial itself, be determinative of the merits of the action, and for the same reasons it is not controlling when the case is considered on affidavits and exhibits under rule 113 of the Buies of Civil Practice. In any event, no useful purpose would be served by harking back to the determination of the motion to vacate the warrant of attachment, which would have no effect at all upon an appellate court reviewing the decision here made of the motions in hand under rule 113. In Rager v. McCloskey (305 N. Y. 75, 78) the court said: “Nor may the doctrine of the law of the case here be invoked. That doctrine, as distinct from res judicata, is limited in application — at least insofar as intermediate or interlocutory determinations are con *624 cerned — to a tribunal of co-ordinate jurisdiction, and the prior ruling* is, therefore, not binding upon this court. ’ ’ To the same effect is Rufo v. Orlando (309 N. Y. 345, 352). In Musco v. Pares (2 A D 2d 689) the court said: “ In any event, regardless of the effect of the previous determination in a court of co-ordinate jurisdiction, it is in no way binding on this court”. Also, as was said of the doctrine of the law of the case in Werthner v. Olenin (186 Misc. 829, 831, affd. 272 App. Div. 798): “ But the doctrine is one of convenience and public policy. (Walker v. Gerli, 257 App. Div. 249, 251; Reamer’s Estate, 331 Pa. 117, 122.) It is not inflexible, and does not have the finality of the doctrine of res judicata. ‘ It must be accommodated to the needs of justice by the discriminating exercise of judicial power ’ (Reamer’s Estate, supra, p. 122; 21 C. J. S., Courts, § 195, p. 334). ”
Accordingly, the plaintiff’s motion for summary judgment under rule 113 of the Rules of Civil Practice is denied, and the defendants’ cross application for summary judgment under that rule is granted. Judgment may be entered in favor of the defendants dismissing the complaint on the merits.
Order signed.